# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| **ROSE DELGADO ET VIR,** | § | |
| **JOE DELGADO,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-06-39** |
| | § | |
| **CITIGROUP INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER

Pending before the Court are Plaintiff's Motion for Judgment (Dkt. #31) and Defendant's

Motion for Summary Judgment (Dkt. #35).  After considering the motions, responses, record and

relevant law, the Court is of the opinion that Plaintiff's motion should be DENIED and Defendant's

motion should be GRANTED.

## Background

In 1965 Rose Delgado ("Delgado") became employed by "Great Western Finance."  (Dkt.

#32-2 at 3).  In 1977, Great Western Finance merged with Control Data Corporation.  (Dkt. #32-2

at 3).  As a result of the merger, Delgado became employed by either Control Data Corporation or

one of its subsidiaries, Commercial Credit Corporation.  (Dkt. #32-2 at 3).  At the time of the merger

Delgado became a participant in the Control Data Retirement Plan ("CDRP").[1]

---

[1] There is some confusion as to whether Delgado initially became a participant in the
Control Data Retirement Plan or the Commercial Credit Retirement Plan.  Defendants have
stated that the Control Data Retirement Plan merged with and into the Commercial Credit
Retirement Plan in 1987.  (Dkt. #35 at 3 n. 8).  Plaintiff has apparently conceded this point as
well as the assertion that Delgado was a participant in the Control Data Retirement Plan.  (Dkt.
#39 at 9).  This is consistent with certain documents that Plaintiff has offered as evidence.  (Dkt.
#35-4); (Dkt. #31-3 at 3).

In 1982, Delgado received a document titled "Planning for the Future" from her employer. (Dkt. #35-4).  The document provides, in part, as follows:

> At Control Data we have a Retirement Plan that works with Social Security to help build your  retirement income.
>
> . . . .
>
> You ARE currently participating in the Control Data Retirement Plan.
>
> . . . .
>
> YOU ARE VESTED IN THE RETIREMENT PLAN.
>
> To give you an idea of the retirement plan benefits you could have, think of yourself as retiring today at 65 years of age with 30 years of credited service.  Based on your 1982 compensation that was eligible for retirement calculation, you would receive a total retirement benefit of $1,351.78 each month.  This is a combined figure with your current Social Security benefit included, and is about 68.23% of your annual income.  Your actual pension benefit will be based on an average of your five highest consecutive years of compensation.

(Dkt. #35-4).

On November 18, 1983, Delgado was involved in a car accident which rendered her totally disabled.  (Dkt. #32-2 at 21).  Delgado took disability leave (Dkt. #32-2 at 21) and never returned to active employment (Dkt. #32-2 at 3).  From April 1984 to October 1994, Delgado received payments from the Control Data Long Term Disability Plan ("LTDP") or its successors in interest. (Dkt. #32-2 at 4).  In order to receive disability benefits, Delgado was repeatedly required to submit a form signed by her physician demonstrating proof of continuing disability.

After her last disability benefits payment, Delgado received a letter dated May 3, 1995 from Judy R. Keller ("Keller"), a disability benefit specialist working at "Northwestern National Life Insurance Company, A ReliaStar Company."  (Dkt. #31-4 at 1-2).  The letter provides, in part, as follows:

2

This letter is to notify you of the closure of your claim for Long Term Disability benefits under the above mentioned plan.  Long Term Disability benefits are available under this plan so long as you meet the eligibility requirements in the plan booklet.

The plan states that benefits will not be paid if you do not provide updates of your condition.  We have been requesting personal updates on the status of your condition since August, 1994.  We have sent you several follow up notices requesting completion of the Proof of Continuance of Disability form and have not received any response from you.  Your lack of response to our requests leaves us with no other option but to close the handling of your claim to benefits.

The effective closure on your claim is November 1, 1994.  There will be no additional benefits payable under this claim.

As a participant in the Long Term Disability Plan provided by your employer, you are entitled to certain rights and protections under the Employee Retirement and Income Security Act of 1974 as amended (ERISA).  Please review your employee handbook for a more detailed explanation of your rights under ERISA.  You or your representative may request a review by writing within 60 days of receipt of this letter stating your reasons for requesting a review.  Enclose any information which may affect the decision to terminate your claim.

(Dkt. #31-4 at 1).  Delgado concedes that she did not submit the requested proof of continuance of disability forms in a timely fashion because of her severe medical condition and because she felt that the requested forms were harassing and unwarranted.  (Dkt. #31-5 at 22).

After Delgado received the above letter, she sent a letter dated May 4, 1995 to Marge Magner and Jo Ann Scroggins of the Commercial Credit Corporation Human Resources Department.   (Dkt. #31-5 at 8-11).   Delgado forwarded copies of this letter to Ceridian

Corporation,[2] Northwestern National Life Insurance Company[3] and the Travelers Companies.[4]  (Dkt. #31-5 at 10).  In her letter, Delgado explained that she worked for Commercial Credit Corporation and had been involved in an accident in 1983 that left her totally disabled.  (Dkt. #31-5 at 8).  Delgado further explained that she was a participant in a "long term plan" and a "retirement plan" and had been receiving long term disability benefits until payment was stopped in October 1994.  (Dkt. #31-5 at 8-9).  Delgado then requested that a grievance committee examine her claims because Northwestern National Life Insurance Company had made "frequent" undue requests for her disability information.  (Dkt. #31-5 at 9).  In her letter, Delgado also requested "a copy of the Long term Plan that governed my employment from 1977 until 1983 [(]my disability date[)], and also the application that I signed to have the long term fee deducted from my payroll checks.  Plan # 133388."  (Dkt. #31-5 at 10).  Delgado further requested "the Complete Plan document that govern[s] my employment Plan coverages."  (Dkt. #31-5 at 10).  Delgado also stated that "I know a lot of coverages have been made and I know as a disabled Employee I have the right to review my Coverage during my employment with Commercial Credit."  (Dkt. #31-5 at 10).  Lastly, Delgado requested "a copy of all Benefit or Plan Coverage that I still have as a Commercial Credit Employee."  (Dkt. #31-5 at 11).

On May 8, 1995, Delgado sent an additional letter to Commercial Credit Corporation.  (Dkt.

---

[2] Ceridian Corporation "spun off" from Control Data Systems, Inc.  (Dkt. #31-3 at 10).  In effect, Control Data Corporation changed its name to Ceridian Corporation.  (Dkt. #31-3 at 10).

[3] Northwestern National Life Insurance Company participated in the administration of Delgado's long term disability benefits.

[4] The Travelers Inc. Retirement Plan was a successor to the Control Data Retirement Plan.

4

#31-5 at 12).  This letter is addressed to the "Pension Plan Dept."  (Dkt. #31-5 at 12).  The letter indicates that in February 1995 Delgado spoke with Flo Srubar of The Travelers, Inc. regarding her pension plan.  (Dkt. #31-5 at 12).  In February 1995, Delgado received a pension plan booklet and subsequently asked Srubar if she could receive her pension immediately, before she turned 65.  (Dkt. #31-5 at 12).  In Delgado's letter, she requested that Commercial Credit "make the necessary arrangement" so that she could receive her pension benefits immediately.  (Dkt. #31-5 at 12).

In a letter dated May 9, 1995, Cherie Niesen ("Niesen"), a Ceridian Senior Human Resources Technician, responded to Delgado's May 4, 1995 letter.  Niesen stated that she would give Delgado whatever information she had, but directed her to Northwestern National Life Insurance Company for "[her] request for an ERISA review" regarding her disability benefits claim.  (Dkt. #31-4).  Niesen further directed Delgado to Travelers Insurance Company for any questions relating to her "Retirement Plan, Life Insurance, Health Care, Dental, etc."  (Dkt. #31-4 at 5).  Niesen provided Delgado with copies of her "1983 W2 indicating which wages were paid" and "a copy of the Long Term Disability Plan in effect in 1980 with a copy of all amendments made through 1983."  (Dkt. #31-4 at 5).

Judy R. Keller of Northwestern National Life Insurance Company responded to Delgado's May 4, 1995 letter in a letter dated May 23, 1995.  (Dkt. #31-4 at 3).  Keller indicated that "the ERISA Committee" reviewed Delgado's submitted information and decided to "maintain the denial of [Delgado's] claim for Long Term Disability Benefits."  (Dkt. #31-4 at 3).  Keller further advised Delgado to submit an attached "Proof of Continuance of Disability form" to have "future benefits reviewed for reconsideration."  (Dkt. #31-4).

Lindsey A. Wright ("Wright"), a Retirement Services employee of The Travelers, Inc., sent

Delgado a letter dated June 8, 1995.  (Dkt. #31-4 at 10-11).  Wright's letter addresses Delgado as

a "Plan Participant" and states in part as follows:

>   <u>Your Accrued Pension Benefit and When it Can Be Paid To You</u>
>
>   Your pension record indicates that your vested accrued benefit under The Travelers,
>   Inc. Pension Plan is a monthly life annuity in the amount of $ 355.85 payable on
>   your normal retirement date, 03/01/2004.  That amount would be paid to you each
>   month during your lifetime and no payments would be due after your death.
>
>   You can start to receive monthly pension payments on the first day of any month
>   following your 55th birthday but your benefit will be reduced actuarially for the time
>   that the commencement of benefit payments precedes your normal retirement date.
>
>   . . . .
>
>   <u>What You Must Do To Start To Receive Your Pension</u>
>
>   •      Read the enclosed materials and become familiar with the options available
>          to you.
>   •      Indicate your elections on the enclosed Benefit Payment Election Form and
>          sign it. . . .

(Dkt. #31-4 at 10-11).  Wright included a "Vested Retirement Benefit Data Sheet" containing

information about various retirement options and a contact phone number.  (Dkt. #31-4 at 12-13).

At the time of Wright's letter, the Travelers Inc. retirement plan was a successor to the CDRP.

On June 30, 1995, Delgado sent a letter to Cherie Nieson of Ceridian indicating that Delgado

received Nieson's letter dated May 9, 1995.  (Dkt. #31-4 at 6-9).  Delgado complained that she did

not receive all of the information that she had requested.  (Dkt. #31-4 at 6).  Delgado specifically

requested that she be sent the original long term disability "policy and application form" signed by

her in 1977.  (Dkt. #31-4 at 6).  Delgado acknowledged that she had received an "amended policy,"

but requested information explaining certain provisions.  (Dkt. #31-4 at 6-8).  Delgado further stated

that she had been subjected to unwarranted physical examinations and had consequentially suffered.

(Dkt. #31-4 at 6-7).  Delgado concluded by stating that she could not communicate via telephone because of her inability to pay.  (Dkt. #31-4 at 9).

Judy Keller responded to Delgado's June 30, 1995 letter, which had been forwarded to her by Neison, in a letter dated July 20, 1995.  (Dkt. #31-4 at 4).  Keller indicated that the "ERISA Committee" reviewed Delgado's "submitted information," on July 19, 1995 and decided to maintain the termination status of her claim for long term disability benefits.  (Dkt. #31-4 at 4).  Keller again advised Delgado to submit a "Proof of Continuance of Disability form" to be considered during "re-review" for future benefits.  (Dkt. #31-4 at 4).

Joanne Scroggins ("Scroggins"), Commercial Credit's Vice President of Human Resources, responded to Delgado's May 4, 1995 letter in a letter dated July 19, 1995.  (Dkt. #31-4 at 14).  Scroggins confirmed that she was aware of Delgado's May 4, 1995 letter and of various conversations Delgado had with the human resources department.  (Dkt. #31-4 at 14).  Scroggins directed Delgado to Northwestern National Life in regards to her long term disability benefits and to Lindsey Wright of Travelers as to her retirement benefits.  (Dkt. #31-4 at 14).  According to Scroggins, Wright was investigating Delgado's retirement benefits and would send her information shortly.[5]  (Dkt. #31-4 at 14).  Scroggins also advised Delgado that her long term disability benefits had been terminated and recommended that Delgado submit her "proof of continuance of disability form."  (Dkt. #31-4 at 14).  Lastly, Scroggins indicated that Delgado had received a copy of the long term disability plan that was effective from 1977 to 1983, along with all amendments made to that plan.  (Dkt. #31-4 at 14).

---

[5]  Scroggins reference to Wright's anticipated provision of information likely refers to Wright's previously described letter.  (Dkt. #31-4 at 10-11).

On August 7, 1995 Delgado spoke with Lindsay Wright by telephone.  (Dkt. #31-5 at 13); (Dkt. #32-11 at 1).  After Delgado received Scroggins' letter dated July 19, 1995, she contacted Wright to inquire about her pension benefits.  (Dkt. #32-2 at 9).  Wright was unable to resolve certain questions that Delgado presented to her regarding her initial participation date and her termination date.  (Dkt. #32-2 at 9).

By February 1996, Delgado had communicated with her attorney, Mr. O.F. Jones III ("Jones").  On February 15, 1996, Jones sent a letter to The Travelers, Inc.  *See* (Dkt. #33-2 at 1).[6] Jane Reinhardt ("Reinhardt") of Travelers Retirement Services responded in a letter dated June 4, 1996.  (Dkt. #33-2 at 1).  In her letter, Reinhardt stated that Delgado's termination date given to Travelers was April 25, 1995.  (Dkt. #33-2 at 1).  Reinhardt further stated that due to Delgado's termination, she had been eligible to receive adjusted pension benefits since May 1, 1995.  (Dkt. #33-2 at 1).

On February 15, 1996, Jones also sent a letter to Judy Keller.  (Dkt. #31-5 at 22).  Jones stated that he consulted with Delgado about her long term disability payments.  (Dkt. #31-5 at 22). Jones also acknowledged that the payments ended because of Delgado's frustration with the requirement of providing continuing proof of disability forms.  (Dkt. #31-5 at 22).  Jones then asked if he could obtain a waiver of the requirement and indicated that he enclosed a copy of a Proof of Continuance of Disability form.  (Dkt. #31-5 at 22).

On February 7, 2001 Delgado filed suit against Ceridian Corporation and ReliaStar Life Insurance Company (herinafter "Ceridian litigation") for long term disability benefits.  *Delgado v.*

---

[6] Delgado asserts that this letter was sent prior to Delgado's 1995 phone conversation with Lindsay Wright.  (Dkt. #31 at 5).  This assertion is inconsistent with the dates on the Travelers letter.

*Ceridian Corp.*, V-01-31 (S.D. Tex. 2001).  Delgado asserted that she was entitled to long term

disability benefits from the date of her allegedly incorrect termination up to her proper retirement

date.  Ultimately, the parties involved in the Ceridian litigation entered into a settlement agreement.

(Dkt. #31-4 at 28-33).  The settlement agreement specifically provides that Delgado "is and has been

disabled since 1984 and that such disability is permanent."  (Dkt. #35-5 at 2).  As a result of the

settlement, Delgado received a lump sum check from Ceridian and ReliaStar.  However, the

settlement agreement did not provide for any continued receipt of long term disability payments, and

Delgado neither expected nor received any long term disability payments after the Ceridian

litigation.  (Dkt. #32-2 at 5).

From 1996 to 2004 Delgado did not make complaints related to her claims for pension

benefits.  (Dkt. #39 at 4).  Delgado did not communicate any complaints during this period because

of "her continued disability and inability to properly handle her affairs, and [due to] the pendency

of the Ceridian litigation."  (Dkt. #39 at 4).

On April 20, 2004, Delgado sent a letter to The Travelers, Inc. addressed to Lindsay Wright.

(Dkt. #31-5 at 13).  Delgado indicated that she spoke to Wright about her pension benefits in 1995.

(Dkt. #31-5 at 13).  Delgado further indicated and that she had previously sent in a pension benefits

application form for early retirement benefits, presumably in 1995, but had not received any

response.  (Dkt. #31-5 at 13).  In addition, the letter contains the following request: "I want to

receive the Pension Plan I have and I am still sick.  So please send it to me.  I would like the 10 year

certain of $ 330.94 a month or the full Amount since it has been just about 10 years since I requested

it."  (Dkt. #31-5 at 13).

Travelers, Inc. responded to Delgado's letter in a letter dated April 29, 2004.  (Dkt. #31-5

9

at 15).  Travelers returned Delgado's letter and informed her that Travelers no longer administered

her pension plan.  (Dkt. #31-5 at 15).  Travelers directed Delgado to Hewitt Associates and provided

contact information for Hewitt's Benefits Service Center.  (Dkt. #31-5 at 15).

On April 11, 2005, Delgado wrote a letter to the Hewitt Benefits Service Center.  (Dkt. #31-5

at 17).  Delgado informed Hewitt that she had been pursuing her pension benefits since 1995 and

that her normal retirement date was March 1, 2004.  (Dkt. #31-5 at 17).  Delgado stated that she had

asked for early retirement since 1995 and that she had not yet received any payments.  (Dkt. #31-5

at 17).  Delgado's letter contains the following written request:

> I would like the ten year certain of $ 330.94 per month or the full Amount, since it
> has been ten years since I requested it.  I should also get interest since my normal
> retirement was due 3-01-2004.  I am enclosing copies of different enclosures for your
> review.  Please submit my request and am waiting your reply.

(Dkt. #31-5 at 17).

Delgado did not send any additional correspondence to the Hewitt Benefits Service Center

subsequent to her April 11, 2005 letter.  However, after receiving Hewitt's contact phone number

in 2004, Delgado repeatedly tried to communicate with Hewitt via phone.  (Dkt. #32-2 at 19).  She

was never successful.  However, Hewitt successfully left 11 messages on Delgado's answering

machine in an effort to communicate about Delgado's pension benefits.  (Dkt. #32-2 at 22).

By December 7, 2005, Delgado was again in communication with Jones.  On December 7,

2005, Jones sent "Citigroup Benefits" a letter regarding Delgado's pension benefits.  (Dkt. #31-5

at 18.)  The address listed on the letter is identical to the address previously referenced for the

Hewitt Benefits Service Center.[7]  (Dkt. #31-5 at 18).  The letter  summarizes Delgado's claim

---

[7] Apparently the Hewitt Benefits Service Center is located at the same address as
"Citigroup Retirement Services."  (Dkt. #33-7 at 3).

history and her desire for pension benefits.  (Dkt. #31-5 at 18).  Jones also asked whether or not

"Citigroup Benefits" was the proper office to make a pension benefits claim.  (Dkt# 31-5 at 18).  The

letter also makes the following request:  "If you are the location that would handle this type of

retirement benefit claim, would you please contact me and advise me why she has not been paid her

benefits in almost 18 months, and what can be done to get her payments started and the arrearage

paid."  (Dkt. #31-5 at 18).  Jones never received a response to this letter.  (Dkt. #31-2 at 4).

On January 7, 2006, the "Citigroup Benefits Center"[8] sent Delgado a "Call Back Notice"

letter.  (Dkt. #33-7).  The letter indicates that the Citigroup Benefits Center attempted to call

Delgado back, but was unable to reach her.  (Dkt. #33-7).  The letter also provides a Hewitt

Associates website address and several contact phone numbers as well as a mailing address.  (Dkt.

#33-7 at 1).

On January 9, 2006, the Citigroup Retirement Services sent Delgado two documents titled

"Citigroup Pension Plan Automatic Payment Notice and Rollover Election Form" and "Citigroup

Retirement Plan Special Tax Notice Regarding Plan Payments."  (Dkt. #33-12 at 1-7).  The first

document indicates in part as follows:

> You are receiving this notice because your employment with Citigroup ended on
> May 30, 2005.  The lump sum value of your vested Citigroup Pension Plan benefit
> is $771.53 as of March 1, 2006.  Because you're no longer employed by Citigroup
> and your benfit is $5,000 or less, the Plan requires that you automatically receive an
> immediate distribution of the lump sum value.  You may choose how to receive the
> payment as described below.

(Dkt. #33-12 at 1).  This information is apparently incorrect.

---

[8] The body of the letter states that "Citigroup Benefits Center" tried to reach Delgado.
However, the letter does not provide an address for the "Citigroup Benefits Center," but instead
provides an address for "Citigroup Retirement Services."

On January 27, 2006 Jones sent another letter to "Citigroup Benefits." (Dkt. #31-5 at 20). Like Jones' prior letter dated December 7, 2005, this letter summarized Delgado's prior history and her desire to receive pension benefits. (Dkt. #31-5 at 20). Jones further expressed uncertainty about certain information provided to Delgado, namely, the date on which Delgado completed her employment and the amount of Delgado's pension benefits. (Dkt. #31-5 at 20). Jones' letter also provides as follows: "I would appreciate it very much if you would review these matters and get in touch with me personally so that we can discuss the situation. As you know, your telephone communication is automated, and it is virtually impossible to reach anyone in your office for this particular purpose." Jones then advised "Citigroup Benefits" that he was prepared to institute litigation if the matter was not resolved quickly. (Dkt. #31-5 at 21). Jones' never received a response to this letter. (Dkt. #31-2 at 4).

On April 4, 2006, Delgado filed this suit. (Dkt #1 at 1). According to Delgado's pleadings, she asserts a claim for benefits, 29 U.S.C. § 1132(a), and a claim for punitive damages because of a failure to receive certain requested information, 29 U.S.C. § 1132(c). Currently, Citigroup Inc. is the only named defendant.

On June 19, 2006, Citigroup Retirement Services sent Delgado several documents. One of these documents is titled "Citigroup Pension Plan Starting Your Pension Benefit" and states "[h]ere is the information you requested to start your pension benefit." (Dkt. #33-10 at 1). The document contains a section titled "What You Need To Do" which contains the following subsections: (1) "Review all the enclosed information"; (2) "Use the Pension Elections Worksheet as a guide in making your decisions"; (3) "Call the Citigroup Retirement Services if there are any errors or changes in the information on the Pension Calculation Statement that was used to calculate your

12

benefit"; and (4) "Make your elections."  (Dkt. #33-10 at 1).  The document also contains sections titled "After You Make Your Elections," "If You Decide Not to Retire" and "For More Information."  (Dkt. #33-10 at 2).

Another document sent to Delgado on June 20, 2006 is titled "Citigroup Pension Plan Elections Worksheet."  (Dkt. #33-10 at 3).  The document is styled as a form with blanks to be filled in by a person considering pension benefits.  (Dkt. #33-10 at 3-5).  The document states the following:

> This worksheet lists all of the decisions you will need to make to start your pension benefit.  Use this worksheet to keep track of your decisions as you review all of the enclosed material.
>
> Once you have completed this worksheet, make your elections by accessing the *Your Benefits Resources*TM Web site at http://resources.hewitt.com/citigroup or by calling Citigroup Retirement Services toll-free at 1-800-881-3938.  Do not return this worksheet by mail.

(Dkt. #33-10 at 3).

The information sent to Delgado includes a document titled "Citigroup Pension Plan Pension Calculation Statement."  (Dkt. #33-10 at 6).  This document indicates that Delgado's "Last Day of Employment" was April 24, 1995, (Dkt. #33-10 at 6), and that her "Credited Service" is 18.25 years (Dkt. #33-10 at 7).  Among several pension options, it is indicated that a $355.85 "Single Life Annuity" is available.  (Dkt. #33-10 at 7).  Also included is another document explaining the various pension options.  (Dkt. #33-10 at 9-12).

Another document sent to Delgado on June 19, 2006 is titled "Citigroup Pension Plan Notice of Rights."  (Dkt. #33-10 at 13).  This document contains sections titled as follows: (1) "Commencement of Benefits"; (2) "Explanation of the Qualified Joint and Survivor Annuity"; (2) "Rights to Waive the Qualified Joint and Survivor Annuity"; (3) "Notification Period"; (4) "Federal

Income Tax Withholding"; and (5) "For More Information."  (Dkt #33-10 at 13-15).

On June 20, 2006, Citigroup Benefits sent Delgado another set of documents which are substantially identical to the documents described above which were sent on June 19, 2006.  (Dkt. #33-9 at 1-20).

On June 1, 2007, Jones received a copy of the Citigroup Pension Plan (" Plan") for the first time.  (Dkt. #39 at 4).  "As a result of a series of corporate mergers and aquisitions, [Control Data Retirement Plan] participants became plan participants in the Citigroup Pension Plan."  (Dkt. #35-16 at 1-2).  Delgado is currently a plan participant under the Citigroup Pension Plan.[9]  (Dkt. #37 at 3).  Despite being in possession of the Citigroup Pension Plan and the Hewitt Associates/Citigroup Retirement Services documents described above, Delgado has not yet filed a formal claim for benefits.

## Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex Corp. v.*

---

[9] Delgado has not provided sufficient evidence to establish that she is a current participant in any pension plan other than the Citigroup Pension Plan.

*Catrett*, 477 U.S. 317, 323-25 (1986).   To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact.  *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.  *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995).  "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).  However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations," or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

### Discussion

Delgado presently urges the court to grant summary judgment on two separate claims.  First, Delgado contends that she is entitled to a certain amount of pension benefits under ERISA.  Second, Delgado maintains that she is entitled to punitive damages as a result of Citigroup's alleged failure to furnish certain documents.  Delgado maintains that these two claims are ripe for favorable summary judgment disposition because the parties' dispute centers on legal questions rather than factual disputes.

15

Citigroup has filed a response in opposition to Delgado's motion as well as its own motion for summary judgment. In addition to several legal arguments on the merits, Citigroup maintains that Delgado's claims are precluded by specific procedural errors, to wit, Delgado's failure to sue a proper defendant and Delgado's failure to exhaust administrative remedies.

## I.      Failure to Sue Proper Parties

### A.      Delgado's 29 U.S.C. § 1132(a) Claim Against Citigroup

Delgado's section 1132(a) claim is properly characterized as a claim for benefits and therefore is brought under 29 U.S.C. § 1132(a)(1)(B). ERISA explicitly permits suits against employee benefit plans as entities. 29 U.S.C. § 1132(d). However, there is a split of authority in the Fifth Circuit as to whether or not an entity other than a pension plan may be sued under 20 U.S.C § 1132(a)(1)(B). *Bernstein v. Citigroup Inc.*, 3:06CV209M, 2006 WL 2329385, *4 (N.D. Tex. 2006)(compiling cases). Courts that permit suits against non-plan defendants in this context require evidence showing that such defendants exert control over plan administration. *E.g.*, *Bernstein*, 2006 WL 2329385, *6-7; *Blum v. Spectrum Restaurant Group, Inc.*, 4:02-CV-92, 2003 WL 1889036, at *8 (E.D. Tex. Apr. 14, 2003); *Cooksey v. Metro Life Ins. Co*, 3:02-CV-2583-M, 2004 WL 1636973, at *3 (N.D. Tex. June 17, 2004); see, e.g., *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997); *Garren v. John Hancock Mutual Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997)("The proper party in an action concerning ERISA benefits is the party that controls administration of the plan.")

Delgado argues that Citigroup controls the administration of the Plan because: (1) "[it] is in fact 'the Plan' itself"; (2) it may appoint and remove members of the "Plans Administration Committee."; and (3) it is a legal entity, whereas the "Plans Administration Committee" and the

Trustee are merely "arms" of Citigroup.  (Dkt. #39 at 6-8).  The Court is not persuaded by Delgado's arguments.

The Citigroup Pension Plan delineates various duties and responsibilities.  Within the document, the "Company" is defined as "the sponsor of The Citigroup Pension Plan which shall be Citigroup Inc. as now constituted. . . ."  (Dkt. #35-19 at 6).  The "Committee" is defined as "the Plans Administration Committee or its successor who are designated by the Company pursuant to Section 11.2 to administer the Citigroup Pension Plan."  (Dkt. #35-19 at 6).  A portion of the Plan titled "Administration,"[10] contains a subcategory titled "Powers and Responsibilities of the Company." (Dkt. #35-19 at 28).  There are two separate sections within this subcategory.  The first of these sections empowers Citigroup to "appoint and remove the Trustee and members of the Committee . . . from time to time as it deems necessary for the proper administration of the plan to assure that The Citigroup Pension Plan is being operated for the exclusive benefit of the participants and their beneficiaries in accordance with the terms of The Citigroup Pension Plan, the Code, and ERISA."  (Dkt. #35-19 at 28).  The second section provides that the "Company shall periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedure established hereunder."  (Dkt. #35-19 at 28).  A separate section of the Plan enables the Company to amend the Plan.  (Dkt. #35-19 at 26).  Also, under a section of the Plan titled "Miscellaneous," the Company and the

_____

[10] This section is within Article XI of the Citibuilder Cash Balance Plan.  The Citibuilder Cash Balance Plan is "Part I" of three parts that make up The Citigroup Pension Plan.  (Dkt. #35-19 at 3).  "The general administrative provisions of Part I . . . [including Article XI] shall apply to any and all benefits accruing or payable under The Citigroup Pension Plan, without regard to whether such accrued benefit or portion thereof is determined under the provisions of Part I, Part II or Part III hereof."  (Dkt. #35-19 at 3).  Delgado's claim for benefits is based on Part II of the Citigroup Pension Plan, namely "The Travelers Group Pension Plan."  (Dkt. #35-19 at 3).

Committee are designated as "named fiduciaries."  (Dkt. #35-19 at 32).

The Citigroup Pension Plan also delineates the duties and responsibilities of the Plans Administration Committee.  Under the previously described section titled "Administration," a subsection is titled "Powers and Duties of the Committee."  (Dkt. #35-19 at 28).  This subsection provides in part as follows:

> The primary responsibility of the Committee is to administer The Citigroup Pension Plan for the exclusive benefit of the participants and their beneficiaries, subject to the specific terms of The Citigroup Pension Plan.  The Committee shall administer The Citigroup Pension Plan in accordance with its terms and shall have the power and discretion to determine all questions arising in connection with The Citigroup Pension Plan.  Any such determination by the Committee shall be conclusive and binding upon all persons.  The Committee may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that The Citigroup Pension Plan shall continue to be deemed a qualified plan under the terms of Code Section 401(a), and shall comply with the terms of ERISA and all regulations issued pursuant thereto.  The Committee shall have all powers necessary or appropriate to accomplish its duties under The Citigroup Pension Plan.
>
> The Committee shall be charged with the duties of the general administration of The Citigroup Pension Plan, including, but not limited to, the following:
>
> . . . .
>
> (b)     to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any participant shall be entitled hereunder;
>
> (c)     to authorize and direct the Trustee with respect to all nondiscretionary or otherwise directed disbursements from the Trust Fund
>
> . . . .
>
> (h)     to assist any participant regarding his rights, benefits, or elections available under The Citigroup Pension Plan.

(Dkt. #35-19 at 28-29).

The record before the Court does not establish that Citigroup is "'the Plan' itself" or that Citigroup's power to hire and fire Committee members warrants relief.  The Citigroup Pension Plan document provides Citigroup with limited authority while assigning the Committee significant discretionary authority over Plan administration.   The Plan provides that "[t]he primary responsibility of the committee is to administer The Citigroup Pension Plan for the exclusive benefit of the participants and their beneficiaries" and that "[a]ny [determinations of questions arising in connection with The Citigroup Pension Plan] by the Committee shall be conclusive and binding upon all persons." (Dkt. #35-19 at 29).  Therefore, the Committee is charged with the administration of the Plan and its decisions are binding.  ERISA requires that Citigroup and the Committee operate in accordance with the Plan document.  29 U.S.C. § 1104.  Furthermore, while Citigroup has the power to hire and fire Committee members, it is not charged with the duty of controlling each and every one of the Committee's actions.  Citigroup's power to hire and fire members of the Plans Administration Committee, without more, is not conclusive of its control over the Committee.  *See Boyer v. J.A. Majors Co. Employees' Profit Sharing Plan*, 481 F.Supp. 454, 457-58 (N.D. Ga. 1979); *Cf. Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1324-25 (9th Cir. 1985)("That the Plan Administrator serves at the pleasure of the Board of Directors makes . . . the Board [a fiduciary] and liable as such only with respect to the selection of the Administrator.").  Importantly, Delgado has not presented sufficient evidence demonstrating that Citigroup has had *de facto* control of Plan administration.  Without such evidence, the Court is unwilling to make Citigroup a party under a *de facto* theory.  *See Musmeci v. Schwegmann Giant Super Markets*, 332 F.3d 339, 349-350 (5th Cir. 2003).

The record before the Court also supports a finding that Citigroup's legal entity status does

not automatically make it a proper defendant.  The Plan document imposes certain fiduciary duties

upon the Committee, irrespective of the individual Committee members' employer.[11]  These duties

involve administration of the Plan.  Similarly, the Plan imposes duties upon Citigroup to hire and

fire Committee members within the bounds of ERISA.[12]  Were any of these fiduciary duties to be

derogated, a suit could likely be commenced.  *See Gelardi*, 751 F.2d at 1325.  Fiduciary duties under

ERISA effectively define unincorporated entities (such as the Committee) and serve to control and

restrict their actions.  The Committee's duties in this case require it to function independently from

Citigroup, even though some Committee members may be otherwise employed by Citigroup.  This

legal framework justifies the treatment of these unincorporated entities as distinct parties in their

representative capacities under 29 U.S.C. § 1132(a)(1)(B).[13]

Delgado has maintained an action for payment of benefits.[14]  Only persons or entities having

responsibility under the Plan for administering benefits are proper parties to this suit.  Therefore, the

Committee and the Plan are proper parties while Citigroup is not.  Accordingly, the Court finds that

Citigroup is not a proper defendant as to Delgado's section 1132(a)(1)(B) claim.

**B.    Delgado's 29 U.S.C. § 1132(c) Claim Against Citigroup**

Title 29 U.S.C. § 1132(c) provides a cause of action for civil penalties against a plan

---

[11] Delgado has not demonstrated that the members of the Committee are otherwise employed by Citigroup.

[12] ERISA imposes standards of conduct upon fiduciaries.  *See* 29 U.S.C. 1104.

[13] This logic carries especial force in this case where there is no evidence demonstrating that Citigroup exerted *de facto* control over Plan administration.

[14] Courts have distinguished between actions to recover benefits and actions for other equitable relief.  *E.g.*, *Bernstein*, 2006 WL 2329385, *8 (citing *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999)).

administrator.  To establish this cause of action, a claimant must show that: (1) the administrator was required by ERISA to make available to the participant the information the participant requested; and (2) the participant requested and the administrator failed or refused to provide the information requested before a court will consider imposing a statutory penalty.  *Bernstein*, 2006 WL 2329385, at *3 (N.D. Tex. July 5, 2006)(citing *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.3d 618, 622 (7th Cir. 1987)).  Under ERISA, an "administrator" is the person specifically so designated by the terms of the instrument under which the plan is operated, or, if an administrator is not so designated, the plan sponsor.  *Bernstein*, 2006 WL 2329385, at *3 (citing 29 U.S.C. § 1002(16)(A)(i)); *Newell v. Aetna Life Ins. Co.*, No. CIV.A. 302-CV-0475M, 2002 WL 1840925, *3 (N.D. Tex. Aug. 8, 2002)(citing 29 U.S.C. § 1002(16)(A)(i) and (ii)).

The Citigroup Pension Plan document specifically designates the "Plans Administration Committee" as the plan administrator.  (Dkt. #35-19 at 6, 28-29); (Dkt. #35-16 at 2).  Therefore, the "Plans Administration Committee" is the "administrator" under ERISA.  Because the "Plans Administration Committee" is the *de jure* "administrator," an action against Citigroup is "untenable."  *Bernstein*, 2006 WL 2329385, at *3 (citing *McKinsey v. Sentry Ins.*, 986 F.2d 401, 405 (10th Cir. 1993);  *Newell*, 2002 WL 1840925, at *3).  Accordingly, the Court finds that Citigroup is not a proper defendant as to Delgado's section 1132(c) claim.

**Conclusion**

Citigroup's motion for summary judgment (Dkt. #35) is GRANTED and Delgado's motion for summary judgment (Dkt. #31) is DENIED.  Delgado is hereby GRANTED leave to amend her complaint to add the proper parties.  Citigroup shall provide Delgado with a summary plan description and all documentation and information necessary to properly file her claim for benefits

and appeals.  Citigroup shall also provide Delgado with all information necessary to serve process on the Plan.[15]

It is so ORDERED.

Signed this 26th day of February, 2008.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

---

[15] 29 U.S.C. § 1132(d) governs service of employee benefit plans as entities.

22